IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BRENDA JACOB,<br><br>        Plaintiff,<br><br>vs.<br><br>ES-O-EN CORP., an Oregon corporation, ES-O-EN CORP., d/b/a TACO BELL #017275, ES-O-EN CORP., d/b/a TACO BELL #4056, JOSUE MEDINA, individually, and AARON FLAHERTY, individually,<br><br>        Defendants. | ORDER AND MEMORANDUM DECISION<br><br><br><br>Case No. 2:06-CV-740 TC |

      Plaintiff Brenda Jacob brings this action against ES-O-EN Corporation d/b/a Taco Bell ("ES-O-EN"), Josue Medina, and Aaron Flaherty. In her complaint, Ms. Jacob alleged that she was sexually harassed for about two weeks and then raped by Mr. Medina at her workplace, a Taco Bell in St. George, Utah. Ms. Jacob made claims for violations of Title VII of the Civil Rights Act of 1964, negligent supervision and retention, sexual assault, negligent or intentional infliction of emotional distress, negligence *per se*, and state safe workplace violations. Before the court is Defendants' motion seeking summary judgment in their favor on each count except the sexual assault claim against Mr. Medina.

1

## BACKGROUND

Ms. Jacob began working as a crew member at the Taco Bell on Sunset Boulevard in St. George, Utah on September 22, 2005.  Crew members' duties include making food and taking customer orders.  At that time, Mr. Flaherty was the general manager of the restaurant and Daniel Bencomo was the assistant manager.  Mr. Medina was in training to become what ES-O-EN formally calls a "shift leader," a position to which ES-O-EN employees also informally refer as "shift manager."  ES-O-EN owned and operated the Taco Bell where Ms. Jacob worked.

In the ES-O-EN employment structure, shift leaders oversee crew members' everyday activities on particular shifts, and are sometimes the highest ranking employees in the restaurant. When the general and assistant managers are not in the restaurant, the highest ranking employee, usually the shift leader, is designated "manager in charge."  Managers and shift leaders apparently have "blue manager cards" that are needed for crew members to clock in and out.  On occasion, shift leaders also have the responsibility for closing the restaurant.  Ms. Jacob testified, without foundational support, that shift leaders may discipline crew members.  All of ES-O-EN's witnesses denied that shift leaders may do so.

According to Ms. Jacob, during the first two weeks of October 2005 Mr. Medina repeatedly smacked his lips at her and touched her in sexually inappropriate ways.  Ms. Jacob acknowledges that she did not report these alleged actions to anyone at ES-O-EN while they were happening.

The alleged rape occurred in the early morning hours of October 17, 2005.  The following is Ms. Jacob's account of the events of that morning, which the court accepts as true for the purposes of this motion.  On the night of October 16, 2005, Ms. Jacob was working late with Mr. Medina and another crew member, Michael Folk.  At around 1:00 a.m., after they had finished

getting the restaurant ready for closing, Mr. Medina sent Mr. Folk home, leaving Ms. Jacob and Mr. Medina alone. Ms. Jacob stayed to give Mr. Medina a ride home after he finished his closing duties, something she had done before. Ms. Jacob asked Mr. Medina to use his "blue manager card" to allow her to clock out so she could wait for him in her car, but he refused. Mr. Medina then told Ms. Jacob that there was a problem with a computer in the office and asked her to help him with it. When she went into the office and sat down next to him, she saw that there was nothing wrong with the computer. Mr. Medina then sexually assaulted and raped Ms. Jacob in various degrading ways for over an hour while they were in the office and then just outside the office door. During the assault, Ms. Jacob resisted and repeatedly told Mr. Medina to stop. After the assault, Mr. Medina said they had to go. Ms. Jacob hurriedly gathered her belongings and clocked out, and Mr. Medina set the building alarm. Ms. Jacob then gave Mr. Medina a ride home, as she was too scared to refuse. When Ms. Jacob arrived home, she woke her mother to tell her what had happened.

Ms. Jacob was scheduled to work later in that day, October 17, and in fact, worked part of that shift with Mr. Medina. The same day, Ms. Jacob reported the incident to Mr. Bencomo. Mr. Bencomo took Ms. Jacob to meet with Mr. Flaherty. Mr. Flaherty suggested that Ms. Jacob go to the hospital for an examination. Mr. Flaherty left a message for Sherri Heaton, an ES-O-EN "area coach," a position just above general manager.

Ms. Heaton and Mr. Flaherty discussed Ms. Jacob's allegations on about October 19. Ms. Heaton immediately directed Mr. Flaherty to make sure that Ms. Jacob and Mr. Medina did not work together and that no one retaliate against Ms. Jacob. Ms. Heaton also instructed Mr. Flaherty to transfer Mr. Medina to another restaurant, but that did not occur.

ES-O-EN began its formal investigation of Ms. Jacob's complaint on October 21.  ES-O-EN argued at the hearing on this motion that Ms. Jacob was uncooperative in its investigation, but did not point to any evidence on the record which lends support to this contention.  ES-O-EN concluded that Ms. Jacob's allegations were untrue, citing reasons for its decision including that Ms. Jacob appeared nonchalant in her reporting of the incident, that she had reportedly been flirtatious with Mr. Medina and other male employees, and that Mr. Medina had been a model employee before the alleged incident.

After Ms. Jacob reported the incident, she and Mr. Medina did not work together.  On October 21 and 22, Ms. Jacob worked the day shift when she had been previously scheduled to work the night shift.  ES-O-EN contends that Ms. Jacob requested one of those changes in shift to go to a school dance.  But Ms. Jacob testified that she was told to stay home during her previously scheduled hours.  Mr. Medina apparently worked all of his scheduled shifts for a few weeks after Ms. Jacob reported the assault, though at some point he was suspended.  At some point after the alleged incident, Mr. Medina was apparently given a pay raise and promoted to from shift leader in training to shift leader.  On October 25, 2005, Mr. Flaherty cited Ms. Jacob for sexual harassment.  According to the citation, Ms. Jacob had poked Mr. Flaherty inappropriately and had punched and kicked Mr. Folk.  At that time, Mr. Flaherty instructed Ms. Jacob to review the corporate sexual harassment policy and view a training video on the subject.  Ms. Jacob quit her employment with ES-O-EN on October 27, 2005.

## ANALYSIS

I. **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 allows a court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56©;  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  Courts must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

II. **Title VII Sexual Harassment**[1]

There are two kinds of actionable sexual harassment under Title VII: hostile work environment and *quid pro quo*. "The gravamen of a *quid pro quo* sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414 (10th Cir. 1987).  "Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is 'sufficiently severe or pervasive to alter the conditions [of the victim's] employment and create an abusive working environment.'" Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243-44 (10th Cir. 2001) (citation omitted).  Ms. Jacob's allegations of rape and assault by Mr. Medina amount to

---

[1] Defendants correctly argue that a Title VII claim against employees in their individual capacities is not appropriate.  See Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993).  Ms. Jacob does not dispute this contention.  Consequently, summary judgment in Mr. Medina and Mr. Flaherty's favor on Ms. Jacob's Title VII claim is granted.

hostile work environment, because these actions could be severe enough to alter Ms. Jacob's conditions of employment and create an abusive work environment. Ms. Jacob did not present evidence that anyone at ES-O-EN conditioned any tangible job benefits on her submitting to conduct of a sexual nature. This rules out a claim of *quid pro quo* sexual harassment.

ES-O-EN does not deny that one instance of assault and rape is sufficient to create a hostile work environment. See, e.g., id. at 1243-44 (proof of "only one incident, [if] it was objectively abusive, dangerous, and humiliating," is sufficient to show hostile work environment). Instead, ES-O-EN seeks a judgment that there are no disputed facts on the record that could support a finding that it is liable for Mr. Medina's alleged acts.

  A  Possible Bases for Employer Liability for Hostile Work Environment

Employers may be liable for hostile work environment sexual harassment either vicariously or in negligence. If the harassment is carried out by a supervisor, an employer can be held vicariously liable. If the harasser is a co-worker and not a supervisor, an employer may be liable in negligence.

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). "No affirmative defense is available [to the employer] . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Id. If no tangible employment action is taken against the victim, however, the employer may raise an affirmative defense. See id. The defense is comprised of two necessary parts: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. (citation omitted).

When the hostile work environment is created by a non-supervisory co-employee's sexual harassment, an employer may be held liable in negligence. "Under this theory of employer liability, the plaintiff must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." Adler, 144 F.3d at 673 (citation and internal quotation marks omitted).

ES-O-EN argues that Mr. Medina is not a "supervisor" for purposes of Title VII, precluding vicarious liability. Moreover, ES-O-EN contends, even if Mr. Medina was Ms. Jacob's supervisor, Ms. Jacob did not suffer a "tangible employment action." Consequently, ES-O-EN can avail itself of the affirmative defense. ES-O-EN maintains that is has proven this affirmative defense.

Regarding possible negligence liability for Mr. Medina's alleged actions, ES-O-EN contends that it had no actual or constructive knowledge of Mr. Medina's alleged unwanted touching and taunting of Ms. Jacob in the first weeks of October 2005. Concerning Ms. Jacob's allegations of sexual assault, which Ms. Jacob promptly reported, ES-O-EN argues that its response was adequate as a matter of law.

      B.      Was Mr. Medina a supervisor for purposes of Title VII?

In determining whether ES-O-EN could be vicariously liable for Mr. Medina's actions, the court first determines whether Mr. Medina was Ms. Jacob's supervisor. There is currently a split of authority on the question of who is considered a "supervisor" for purposes of Title VII. On one side, courts such as the Seventh Circuit have adopted a bright line rule that only employees with the power to hire, fire, or discipline their victims are supervisors. See, e.g., Hall

v. Bodine Elec. Co., 276 F.3d 345, 356 (7th Cir. 2002). On the other side, courts including the Second Circuit have taken a broader view of which employees can be treated as supervisors under Title VII. See Mack v. Otis Elevator Co., 326 F.3d 116, 123-27 (2nd Cir. 2003). Under this view, courts do not end the inquiry with the harasser's ability to hire, fire and discipline the victim but also consider factors including an harasser's ability to direct the victim's everyday work activities. See id. at 127. See also Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1254, 1266 (M.D. Ala. 2001) (determining who is a Title VII supervisor involves a "multifactorial analysis rather than simplistic taxonomy"). Not surprisingly, ES-O-EN urges the court to follow the Seventh Circuit and hold that Mr. Medina was not Ms. Jacob's supervisor because he had no power to fire, hire or discipline her. Ms. Jacob argues that various facts could be used to lead to the conclusion that Mr. Medina was indeed her supervisor.

The parties did not cite, and the court did not locate, any Tenth Circuit case expressly adopting either test for determining who is a "supervisor." The Tenth Circuit, however, has given some guidance on the issue. For example, in Harrison v. Eddy Potash, Inc., 158 F.3d 1371 (10th Cir. 1998), the court held that an employer could be held vicariously liable for the actions of an employee given apparent authority, as well as harassment by a supervisor abusing delegated powers. 158 F.3d at 1374-75 (citing Ellerth, 524 U.S. at 749). In Hirschfeld v. New Mexico Corrections Dept., 916 F.2d 572 (10th Cir. 1990), the court held that an employer was not liable for a non-supervisor's harassment of the plaintiff, because even though the employer had granted some authority to the harasser, "there was no evidence indicating that [the harasser] ever invoked [his] authority to facilitate his harassment of plaintiff." 916 F.2d at 579 (footnote omitted).

Ellerth, Harrison, and Hirschfeld appear to reject an inflexible test for determining who is

a supervisor under Title VII. Certainly, an employee who can hire, fire and discipline potential victims will be considered a supervisor. But a bright line rule stopping the inquiry there would eliminate cases where an employer grants an employee some power over other employees and that employee directly misuses that power to further the harassment of another employee. Hirschfeld strongly suggests that an employer may be vicariously liable in those circumstances, as do Ellerth and Harrison.[2] Moreover, a restrictive test would discourage courts from properly examining whether an alleged harasser was acting with apparent authority. Accordingly, the court will examine what authority, if any, ES-O-EN granted Mr. Medina and whether Mr. Medina misused that authority to further his alleged harassment of Ms. Jacob.

First, other ES-O-EN employees referred to Mr. Medina as "shift leader," "shift manager" and "manager in charge." At times, Mr. Medina was the highest ranking employee in the restaurant. He oversaw crew members' everyday work. Mr. Medina held a "blue manager card" so he could enable crew members to clock in and clock out. He apparently could ask crew members to stay later than their scheduled hours. He sometimes closed the restaurant and had responsibilities related to that, such as setting the alarm and locking the restaurant. It also appears that in addition to Ms. Jacob, one other crew member had the impression that Mr. Medina was a manager. (See Dep. of Michael Troy Halsey at 35, attached as Ex. 5 to Pl.'s Memo. in Opp. ("[Mr. Medina] was, for all intents and purposes, a shift lead, which is, to my best knowledge, a form of management at Taco Bell.")) A reasonable person could conclude from these facts that ES-O-EN had granted Mr. Medina considerable authority that elevated him

---

[2]Even the Seventh Circuit has implied, though not definitively stated, that this type of circumstance might be an exception to its rule. See Gawley v. Indiana Univ., 276 F.3d 301 (7th Cir. 2001) (court reluctant to apply bright-line rule when a harasser's use of special powers and position may have directly aided his harassment of victim, even though harasser was not victim's supervisor).

above other employees.

Moreover, there is evidence that Mr. Medina directly misused his authority to further his alleged rape of Ms. Jacob. Ms. Jacob alleges that Mr. Medina had the discretion to decide whether she or Mr. Folk was sent home the morning of October 17 and Mr. Medina used that power to get her alone. Ms. Jacob also testified that Mr. Medina refused to use his "blue manager card" to clock her out, making her feel obliged to wait inside for him. She also points to the fact that he instructed her to inspect the supposedly malfunctioning computer to get her close to him.

Given that Ms. Jacob has shown a factual dispute on these issues, the court can not conclude as a matter of law that Mr. Medina was not a supervisor for Title VII purposes but leaves that question for the trier of fact.

  C.  Did ES-O-EN take a "tangible employment action" against Ms. Jacob?

The next question, then, is whether Mr. Medina's alleged harassment culminated in a tangible employment action against Ms. Jacob. If it did, ES-O-EN is automatically liable. If it did not, ES-O-EN is entitled to raise the two-part affirmative defense. See Ellerth, 524 U.S. at 765.

As an initial matter, ES-O-EN asserts that under the Title VII analysis, a tangible employment action must have been taken by the same individual who perpetrated the harassment to make an employer automatically liable for hostile work environment. ES-O-EN does not cite any case law for this proposition, however, and it does not seem to have support from Ellerth. In Ellerth, the Supreme Court stated that an employer is vicariously liable for sexual harassment "when the supervisor's harassment culminates in a tangible employment action." 524 U.S. at 765. It is not difficult to imagine a situation where one supervisor creates a hostile work

environment for a victim and then enlists another supervisor to take some work-related action against the victim. In that situation, the first supervisor's harassment would surely have culminated in tangible employment action, even if another supervisor took the action. Cf. Hooker v. Wentz, 77 F. Supp. 2d 753, 756-57 (W.D. Va. 1999) (holding that employer's refusal to consider plaintiff for a promotion was not a culmination of supervisor's hostile work environment harassment because the refusal was made by a different supervisor and was "*not* related to the alleged sexual harassment") (emphasis added).

In any event, it does not appear that any tangible employment action was taken against Ms. Jacob by anyone at ES-O-EN. Ms. Jacob argues that she was constructively discharged, which, under Pennsylvania State Police v. Suders, 542 U.S. 129, 151 (2004) can be a tangible employment action for Title VII purposes if it is a result of the employer's official acts. The official acts Ms. Jacob cites as amounting to a constructive discharge are ES-O-EN's favorable treatment of Mr. Medina after she reported the alleged rape, ES-O-EN's shifting of her schedule, and Mr. Flaherty's citing her for sexual harassment after she reported the rape to him. But these acts do not amount to constructive discharge.

"Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." MacKenzie v. City and County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005). Moreover, "[a] finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee-claimant." Id. (footnote omitted). The actions Ms. Jacob assert ES-O-EN took against her, when viewed as a whole, are not subjectively intolerable. Nor is there any evidence that they were deliberately taken to drive her to quit.

While Ms. Jacob may have preferred to see Mr. Medina's shift changed to ensure that the two did not work together, there is no evidence that could lead one to infer that ES-O-EN moved Ms. Jacob to the day shift to try to worsen her working conditions. What's more, Ms. Jacob has not submitted evidence that the day shift was in any way less desirable than the night shift. Moreover, Ms. Jacob does not deny that she was responsible for the behavior that led her to be cited for sexual harassment by Mr. Flaherty. There is nothing on the record that would reasonably lead one to believe that the write up was a culmination of the alleged sexual assault.

Finally, it is clear that Ms. Jacob would have subjectively preferred that Mr. Medina immediately face some negative consequence after she made her allegations. There are no facts, however, that ES-O-EN's positive treatment of Mr. Medina after the alleged incident was designed to drive Ms. Jacob to quit. Further, it appears that Ms. Jacob had quit working for ES-O-EN before much of ES-O-EN's positive treatment of Mr. Medina occurred.

Because there are no facts supporting a finding the Ms. Jacob was constructively discharged, the court concludes that ES-O-EN did not take tangible employment action against Ms. Jacob. ES-O-EN is therefore entitled to present facts related to its two-part affirmative defense in the event that Mr. Medina is found to be Ms. Jacob's supervisor by the trier of fact.

    D.    <u>ES-O-EN's Affirmative Defense</u>

As explained above, if Mr. Medina was a supervisor and created a hostile work environment that did not result in a tangible employment action against the Ms. Jacob, ES-O-EN has a two-part affirmative defense to vicarious liability. ES-O-EN must show that it took reasonable care to prevent and correct the harassment and that Ms. Jacob unreasonably failed to take advantage of corrective or preventive opportunities against harassment. See <u>Ellerth</u>, 524

U.S. at 765. ES-O-EN contends that it took corrective action by separating Ms. Jacob and Mr. Medina. ES-O-EN further asserts that Ms. Jacob unreasonably failed to take advantage of corrective opportunities by refusing to be interviewed during the investigation of her claim.

But simply separating Mr. Medina and Ms. Jacob is not enough as a matter of law to say that ES-O-EN took reasonable corrective action. While such an action alone may indeed be found to be reasonable at trial, an inference may also be made that ES-O-EN should have done more given the severity of Ms. Jacob's allegation. See Wilson v. Tulsa Junior College, 164 F.3d 534, 542-43 (10th Cir. 1998) (in negligence context, assessing adequacy of employer's response to report of hostile work environment includes consideration of whether the response was proportional to the seriousness of allegations). Moreover, ES-O-EN has not pointed to any evidence that would lead one to conclude that Ms. Jacob was uncooperative in its investigation or otherwise unreasonably failed to take advantage of ES-O-EN's corrective efforts. For her part, Ms. Jacob did report the rape promptly to ES-O-EN and went to the hospital as recommended by ES-O-EN employees, showing that she made some efforts to assist ES-O-EN's efforts to prevent and correct the reported harassment.

In sum, there are facts on the record from which a reasonable person could conclude that ES-O-EN has not established its affirmative defense.

      E.     Negligence Liability

Should the finder of fact conclude that Mr. Medina was not a supervisor under Title VII, ES-O-EN can only be liable for Mr. Medina's alleged actions in negligence. In that event, Ms. Jacob must show that ES-O-EN had constructive or actual knowledge of Mr. Medina's harassment but failed to adequately respond. See Adler, 144 F.3d at 673.

As an initial matter, the evidence shows that ES-O-EN had no knowledge of the

harassment Ms. Jacob alleges occurred in the first weeks of October. The events she describes did not appear to be especially serious or pervasive, and Ms. Jacob did not report it. See id. Since it appears that ES-O-EN did not learn of these events until after Ms. Jacob had quit, ES-O-EN cannot be liable for them in negligence.

The alleged rape is another issue, as Ms. Jacob reported this incident almost immediately. The only question is whether ES-O-EN adequately responded to Ms. Jacob's allegations. As with its affirmative defense to vicarious liability, ES-O-EN maintains that its response of separating Ms. Jacob and Mr. Medina and investigating her report are adequate as a matter of law. But ES-O-EN is off the mark. In Wilson, the Tenth Circuit explained that the inquiry into the adequacy of an employer's response to reported harassment includes assessing whether that response was reasonably likely to prevent the misconduct from recurring, and whether the response was proportional to the seriousness of the reported harassment. 164 F.3d at 542-43. Here, Ms. Jacob reported to ES-O-EN that Mr. Medina had abused his power to get her alone in the restaurant and sexually assault and rape her. Given the shocking nature of the allegations, making sure Mr. Medina and Ms. Jacob did not work at the same time may be found by a reasonable person to be an inadequate response. For example, Ms. Heaton's first instinct was to transfer Mr. Medina to another ES-O-EN restaurant location, but that did not happen.

For the above reasons, the court cannot decide this question as a matter of law.

**III.    Negligent or Intentional Infliction of Emotional Distress**

    A.    ES-O-EN and Mr. Flaherty

Ms. Jacob concedes that her claim of negligent or intentional infliction of emotional distress is preempted by the Utah Worker's Compensation Act with respect to ES-O-EN and Mr. Flaherty. See Hirasi-Doi v. U.S. West Commc'ns, Inc., 61 F.3d 777 (10th Cir. 1995). Summary

judgment in their favor on this count is therefore granted.[3]

      B.    Mr. Medina

Defendants' argument for summary judgment on Ms. Jacob's emotional distress claim in Mr. Medina's favor was that Ms. Jacob had not done enough to show significant emotional distress. After Defendants filed their motion, however, Ms. Jacob submitted an expert report detailing the damages caused to Ms. Jacob by Mr. Medina's alleged actions. This report renders Defendants' argument moot and makes summary judgment on this claim in Mr. Medina's favor inappropriate.

### IV.   Negligence *Per Se*

      A.    ES-O-EN and Mr. Flaherty

Ms. Jacob does not allege that ES-O-EN or Mr. Flaherty directly violated any statute, much less a safety statute. Therefore, summary judgment on Ms. Jacob's negligence *per se* claim is granted in ES-O-EN's and Mr. Flaherty's favor.

      B.    Mr. Medina

Ms. Jacob asserts that Mr. Medina violated Utah's criminal code by committing rape, sodomy and forcible sexual abuse. She contends that since she is part of the class meant to be protected by these statutes, Mr. Medina's alleged violation of them would be negligence *per se*.

Before the violation of a statute may be considered negligence *per se*, a plaintiff must establish that a court has adopted it as a safety standard. See Rollins v. Petersen, 813 P.2d 1156, 1164 n.4 (Utah 1991). In Rollins, the court also approvingly cited an Arizona case for the proposition that "penal statutes do not create civil cause of action unless expressly stated in

---

[3] Ms. Jacob also concedes that her negligent retention and supervision and state safe workplace counts are preempted by the Act, citing Utah Code Ann. § 34A-2-105(1) (2008). Summary judgment will therefore be granted in favor of all Defendants on these counts.

statute or clearly implied in legislative intent." See id. at 1164 (summarizing Sellinger v. Freeway Mobile Home Sales, Inc., 511 P.2d 682 (Ariz. App. Ct. 1973)).  Moreover, "in Utah, 'criminal culpability generally constitutes only evidence of negligence in a civil action, rather than negligence per se as a matter of law.'" Miller v. Gastronomy, Inc., 110 P.3d 144, 148 (Utah Ct. App. 2005) (citation omitted).

Ms. Jacob has not shown why a violation of the criminal statutes she cites could properly be treated as negligence *per se* under Utah law rather than only evidence of negligence, which is Utah's general rule.  Moreover, these statutes all appear to prohibit voluntary conduct, as opposed to setting safety standards.  Summary judgment on Ms. Jacob's negligence *per se* claim is therefore granted in Mr. Medina's favor.

**ORDER**

For the reasons set forth above, the court GRANTS in part and DENIES in part the Defendants' motion for partial summary judgment and orders as follows:

1.  On Count One, the Title VII hostile work environment sexual harassment claim, summary judgment is GRANTED in favor of Mr. Medina and Mr. Flaherty and DENIED as to ES-O-EN.  Ms. Jacob may proceed on the theory that ES-O-EN may be vicariously liable or liable in negligence for Mr. Medina's alleged actions.  ES-O-EN may raise an affirmative defense to vicarious liability if Mr. Medina is found to be a supervisor for Title VII purposes.

2.  On Count Two, negligent retention and supervision, summary judgment is GRANTED in favor of all Defendants.

3.  On Count Four, negligent or intentional infliction of emotional distress, summary judgment is GRANTED in favor of ES-O-EN and Mr. Flaherty and DENIED as to Mr. Medina.

4.  On Count 5, negligence *per se*, summary judgment is GRANTED in favor of all

Defendants.

  5.  On Count 6, state safe workplace, summary judgment is GRANTED in favor of all Defendants.

  IT IS SO ORDERED this 19th day of February, 2008.

           BY THE COURT:

           *Tena Campbell*

           TENA CAMPBELL
           Chief Judge